ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ANGELA L. SCOTT (Cal. Bar No. 240418)
Assistant United States Attorney
OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-6683
     Facsimile:  (213) 894-0142
     E-mail:     angela.l.scott@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-209-DMG |
|---|---|
| Plaintiff, | DOCUMENT IN SUPPORT OF GOVERNMENT'S REQUEST FOR DETENTION |
| v. | |
| JORGE BERISTAIN HUERTA, | |
| Defendant. | |


     Please take notice that the government hereby files the

attached document in support of government's request for detention.



Presented by:

     /s/
_____
ANGELA L. SCOTT
Assistant United States Attorney

AO 93  (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>**6346 AGNES AVENUE,**<br>**NORTH HOLLYWOOD, CALIFORNIA** | )<br>)<br>)  Case No.   1 4 - 0 7 4 8 M<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:
        See Attachment A-1

        The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
        See Attachment B

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

        **YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its issuance
                                                                                    *(not to exceed 14 days)*
☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                            *(name)*

        ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                                ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   4/14/14 @ 6:18 p.m.        _Margaret A. Nagle_
                                                                            *Judge's signature*

City and state:    Los Angeles, California          Hon. Margaret A. Nagle, U.S. Magistrate Judge
                                                                    *Printed name and title*

AUSA: Angela L. Scott

000209

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| *Return* | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| [Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.] |

| *Certification*  (by officer present during the execution of the warrant) |
|---|
| *I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.* |

*Date:* _____

_____
*Executing officer's signature*

_____
*Printed name and title*

ATTACHMENT A-1

<u>PLACE TO BE SEARCHED:</u>

6346 AGNES AVENUE, NORTH HOLLYWOOD, CA (hereinafter, the "HUERTA RESIDENCE") is a single story single family home with a detached garage located on Agnes Avenue and is peach in color with white trim. The numbers "6346" are spray painted in black with white background on the curb in front of the HUERTA RESIDENCE. Additionally, the numbers "6346" are affixed to the trim above the front door of HUERTA's residence which faces north. HUERTA's residence is the first residential property on the east side of Agnes Avenue, south of Victory Boulevard. The front door of the residence has a white screen door which faces north. The detached garage is east of the residence and faces north. There is a walk through gate located just to the west of the garage and a drive through gate located to the left as you face the garage.

ATTACHMENT B

ITEMS TO BE SEIZED:

1.      The items to be seized are evidence, fruits, and instrumentalities of conspiracy to distribute controlled substances, and distribution of controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1):

   a.  Any controlled substance;

   b.  Paraphernalia commonly associated with the manufacture and packaging for sale or the transportation of controlled substances, to include cutting agents and diluents, chemical testing devices, packaging materials such as glycine or plastic bags, tupperware, cellophane, heat sealers, triple beam scales and other weighing devices, measuring devices, strainers, boxes, and compression devices;

   c.  Cash over $2,000 and stored-value cards;

   d.  Telephones, including cellular telephones, pagers, beepers, answering machines, and other communication devices, and communication device documentation (e.g., customer service records, billing statements, credit information, toll records, etc.) potentially utilized by JORGE BERISTAIN HUERTA or other identified or unidentified co-conspirators;

   e.  Any digital device used to facilitate the above-listed violations and forensic copies thereof;

   f.  With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of the same, sufficient to show the actual user(s) of the digital device during the time period between September 2013 to present;

   g.  Any vehicles found on or near the SUBJECT PREMISE (parked on the street near the front of the residence) and registered to JORGE BERISTAIN HUERTA or suspected to be utilized by; (Man) HUERTA or other identified or unidentified co-conspirators to facilitate the above-listed violations, including through evidence obtained during the execution of the search warrant which tends to demonstrate HUERTA's exercise of domain, control, or ownership over the vehicles in question;

   h.  Any navigation systems, handheld or vehicle mounted, that may contain recently traveled addresses, stored addresses, or favorite addresses which may have been utilized by HUERTA, or other identified or unidentified co-conspirators to provide directions to locations in which narcotics or narcotics proceeds have been picked up or delivered, or other locations utilized to facilitate the narcotics trafficking of HUERTA;

   i.  Items used in the packaging of currency for consolidation and transportation, such as money counting machines, money wrappers, rubber bands, duct or wrapping tape, and plastic sealing machines;

**Instrumentality Protocol**

j. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

k. Drug or money ledgers, drug distribution or customer lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

l. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items reflecting names, addresses, telephone numbers, or communications of members and associates involved in drug trafficking activities;

m. Documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals and stones, jewelry or other items obtained with the proceeds of drug trafficking activities;

n. Records of off-site storage locations, including safe deposit box keys, records, receipts and rental agreements for storage facilities;

o. Records, items and documents reflecting travel for the purpose of participating in drug trafficking or money laundering activities, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

p. Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition silencers, components of firearms including components or tools which can be used to modify firearms, ammunition and ammunition components including gunpowder, primers, bullets, shells, wads, shot, and the tools used for the manufacture of ammunition including reloading devices, dies, scales, books, pamphlets and documentation, which may be used to facilitate money laundering and drug trafficking activities; and

q. Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including delivered mail, whether inside the location or in the mail box/s, utility bills, telephone bills, personal letters, personal identification, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, tax statements, payroll check stubs, keys and receipts for safe deposit box(s), keys and receipts for rental storage space, keys and receipts for post office box or mail drop rentals, ignition keys, car door and trunk keys, residence keys, vehicle ownership certificates or "pink slips," and/or vehicle registration slips.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and

**Instrumentality Protocol**

drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

4. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

   a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

   b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

   c. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

   d. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   e. When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

   f. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   g. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

**Instrumentality Protocol**

h.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

j.  The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

k.  Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

l.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

    i.  Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

    ii.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

    iii.  Any magnetic, electronic, or optical storage device capable of storing digital data;

    iv.  Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

    v.  Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

    vi.  Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

    vii.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

**Instrumentality Protocol**

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**Instrumentality Protocol**



AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
**6346 AGNES AVENUE,
NORTH HOLLYWOOD, CALIFORNIA**

)
)
)
)
)
)

Case No. **14-0748M**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the ___Central___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

FILED
CLERK, U.S. DISTRICT COURT

APR 1 4 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 (conspiracy to distribute controlled substances) | See attached Affidavit |
| 21 USC 841(a)(1)(distribution of controlled substances) | |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

FBI Special Agent Michael Alker
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __4/14/14__

*Margaret A. Nagle*
*Judge's signature*

City and state: Los Angeles, California

Hon. Margaret A. Nagle, U.S. Magistrate Judge
*Printed name and title*

AUSA: Angela L. Scott

000217

ATTACHMENT A-1

<u>PLACE TO BE SEARCHED:</u>

6346 AGNES AVENUE, NORTH HOLLYWOOD, CA (hereinafter, the "HUERTA RESIDENCE") is a single story single family home with a detached garage located on Agnes Avenue and is peach in color with white trim. The numbers "6346" are spray painted in black with white background on the curb in front of the HUERTA RESIDENCE. Additionally, the numbers "6346" are affixed to the trim above the front door of HUERTA's residence which faces north. HUERTA's residence is the first residential property on the east side of Agnes Avenue, south of Victory Boulevard. The front door of the residence has a white screen door which faces north. The detached garage is east of the residence and faces north. There is a walk through gate located just to the west of the garage and a drive through gate located to the left as you face the garage.

ATTACHMENT B

ITEMS TO BE SEIZED:

1.      The items to be seized are evidence, fruits, and instrumentalities of conspiracy to distribute controlled substances, and distribution of controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1):

   a.   Any controlled substance;

   b.   Paraphernalia commonly associated with the manufacture and packaging for sale or the transportation of controlled substances, to include cutting agents and diluents, chemical testing devices, packaging materials such as glycine or plastic bags, tupperware, cellophane, heat sealers, triple beam scales and other weighing devices, measuring devices, strainers, boxes, and compression devices;

   c.   Cash over $2,000 and stored-value cards;

   d.   Telephones, including cellular telephones, pagers, beepers, answering machines, and other communication devices, and communication device documentation (e.g., customer service records, billing statements, credit information, toll records, etc.) potentially utilized by JORGE BERISTAIN HUERTA or other identified or unidentified co-conspirators;

   e.   Any digital device used to facilitate the above-listed violations and forensic copies thereof;

   f.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of the same, sufficient to show the actual user(s) of the digital device during the time period between September 2013 to present;

   g.   Any vehicles found on or near the SUBJECT PREMISE (parked on the street near the front of the residence) and registered to JORGE BERISTAIN HUERTA or suspected to be utilized by HUERTA or other identified or unidentified co-conspirators to facilitate the above-listed violations, including through evidence obtained during the execution of the search warrant which tends to demonstrate HUERTA's exercise of domain, control, or ownership over the vehicles in question;

   h.   Any navigation systems, handheld or vehicle mounted, that may contain recently traveled addresses, stored addresses, or favorite addresses which may have been utilized by HUERTA, or other identified or unidentified co-conspirators to provide directions to locations in which narcotics or narcotics proceeds have been picked up or delivered, or other locations utilized to facilitate the narcotics trafficking of HUERTA;

   i.   Items used in the packaging of currency for consolidation and transportation, such as money counting machines, money wrappers, rubber bands, duct or wrapping tape, and plastic sealing machines;

**Instrumentality Protocol**

j.  Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

k.  Drug or money ledgers, drug distribution or customer lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

l.  Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items reflecting names, addresses, telephone numbers, or communications of members and associates involved in drug trafficking activities;

m.  Documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals and stones, jewelry or other items obtained with the proceeds of drug trafficking activities;

n.  Records of off-site storage locations, including safe deposit box keys, records, receipts and rental agreements for storage facilities;

o.  Records, items and documents reflecting travel for the purpose of participating in drug trafficking or money laundering activities, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

p.  Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition silencers, components of firearms including components or tools which can be used to modify firearms, ammunition and ammunition components including gunpowder, primers, bullets, shells, wads, shot, and the tools used for the manufacture of ammunition including reloading devices, dies, scales, books, pamphlets and documentation, which may be used to facilitate money laundering and drug trafficking activities; and

q.  Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including delivered mail, whether inside the location or in the mail box/s, utility bills, telephone bills, personal letters, personal identification, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, tax statements, payroll check stubs, keys and receipts for safe deposit box(s), keys and receipts for rental storage space, keys and receipts for post office box or mail drop rentals, ignition keys, car door and trunk keys, residence keys, vehicle ownership certificates or "pink slips," and/or vehicle registration slips.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and

Instrumentality Protocol

drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

SEARCH PROCEDURE FOR DIGITAL DEVICES

4.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

   a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

   b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

   c.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

   d.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   e.  When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

   f.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   g.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

Instrumentality Protocol

h.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

j.  The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

k.  Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

l.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

   i.  Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

   ii.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

   iii.  Any magnetic, electronic, or optical storage device capable of storing digital data;

   iv.  Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

   v.  Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

   vi.  Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

   vii.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

**Instrumentality Protocol**

5.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**Instrumentality Protocol**

# A F F I D A V I T

I, Michael E. Alker, being duly sworn, hereby depose and say:

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since August of 2008.   I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7).   I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

## PURPOSE OF THE AFFIDAVIT

2.      On April 10, 2014, a grand jury in the Central District of California returned a sealed indictment, 14-CR-209 ("the Indictment" which is attached hereto as Exhibit 1) charging the following defendants with various narcotics offenses:   Ismael Gutierrez VILAVAZO, also known as ("aka") "Ismael Gutierrez," aka "Mike Gutierrez," aka "Mikey," hereinafter referred to as "VILAVAZO," and Jorge Beristain Huerta, aka "Moreno," hereinafter referred to as "HUERTA."

3.      This affidavit is submitted in support of search warrants for evidence, fruits, and instrumentalities of conspiracy to distribute controlled substances, and distribution of controlled substances, in violation of 21 U.S.C §§ 846 and 841(a)(1), as those items are set forth in ATTACHMENT B (hereby incorporated) at the following locations, which are further described in ATTACHMENT A-1 and A-2 and are collectively referred to as the "SUBJECT PREMISES":

     a.   6346 AGNES AVENUE, NORTH HOLLYWOOD, CA (hereinafter, the "HUERTA RESIDENCE") is a single story single family home with a detached garage located on Agnes Avenue and is peach in color with white trim. The

**Instrumentality Protocol**

1

000224

numbers "6346" are spray painted in black with white background on the curb in

front of the HUERTA RESIDENCE. Additionally, the numbers "6346" are affixed

to the trim above the front door of HUERTA's residence which faces North.

HUERTA's residence is the first residential property on the East side of Agnes

Avenue, South of Victory Boulevard. The front door of the residence has a white

screen door which faces north. The detached garage is East of the residence and

faces North. There is a walk through gate located just to the West of the garage and

a drive through gate located to the left as you face the garage.

b.  WHITE CHRYSLER 300 SEDAN bearing CA plate 6FDD718, registered to

Samuel Lopez at the HUERTA RESIDENCE (hereinafter, "HUERTA's

VEHICLE").   I am also requesting to search HUERTA's VEHICLE whether it is

within the HUERTA RESIDENCE's curtilage or not.

4.    This affidavit is intended to show that there is sufficient probable cause for the

requested warrants, and does not purport to set forth all knowledge of my investigation into this

matter.   Therefore, I have not included every fact about the investigation that is known to me, nor

have I attempted to identify each witness to every surveillance or other activity described herein.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit

are related in substance and in part only.   All figures, times, and calculations set forth herein are

approximate.

5.    I also request permission to search the vehicles at the HUERTA RESIDENCE that

the residents of the locations have access to, provided that prior to searching said vehicle, it is

confirmed that said vehicle is registered to, owned by, possessed by, used by, or otherwise under

**Instrumentality Protocol**

2

the control of, an individual residing at the SUBJECT PREMISES.

6.      Regarding the HUERTA RESIDENCE, I also request permission to search

outbuildings, such as garages, carports and sheds to which the residents of the locations have

access.

## TRAINING AND EXPERIENCE

7.      I am currently assigned to a squad that investigates criminal enterprises.   This

squad conducts major narcotics, money laundering, kidnapping, extortion and public corruption

investigations associated with transnational criminal enterprises.   This squad is comprised of

Special Agents from the FBI.   As part of my work, including this investigation, I also work with

Special Agents from the Drug Enforcement Administration ("DEA"), and local law enforcement

personnel designated as federal Task Force Officers ("TFOs").

8.      From 2009 until 2013 I investigated national security matters and international

terrorism in relation to violations of federal laws such as conspiracy to use weapons of mass

destruction, conspiracy to murder officers and employees of the United States, money laundering,

structuring, material support to terrorism, use of an explosive device to commit a felony, marriage

fraud, immigration fraud, false information and hoaxes, and making false statements.   I was

previously assigned to the Southern California Drug Task Force/High Intensity Drug Trafficking

Area ("SCDTF/HIDTA") in Los Angeles, California.   The SCDTF/HIDTA conducts major

narcotics investigations and is comprised of Special Agents from the FBI, DEA, the Bureau of

Immigration and Customs Enforcement ("ICE"), the Internal Revenue Service ("IRS"), and TFOs.

9.      I have participated in investigations concerning the identification of

co-conspirators through the use of telephone records and bills, financial records, photographs, and

**Instrumentality Protocol**

3

other documents.   I have directed and assisted in the handling of confidential sources to gather intelligence through various methods to include consensual recordings.   I have executed search warrants for controlled substances and I have conducted physical surveillance in connection with narcotics investigations.   I have also conducted investigations in which I have used Global Positioning System ("GPS") information to locate and track persons who are the subjects of criminal investigations.

10.   Based upon my experience and training with the FBI as well as conversations that I have had with other, more experienced agents and law enforcement officers who specialize in narcotics investigations, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations.   I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews.   Through my conversations with these agents and other law enforcement officers, I am knowledgeable in the methods and modes of narcotics operations and the language patterns typical of narcotics trafficking.   Based on my training and experience, I know that narcotics traffickers often use coded language when discussing narcotics trafficking activities, and I have participated in narcotics investigations in which I have deciphered monitored calls containing coded language.   I have become familiar with the methods of operation typically used by narcotics traffickers.   I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.   I know that professional narcotics operations depend upon maintaining timely long-distance and local contacts with the original

**Instrumentality Protocol**

4

suppliers and those down the organizational chain to the local traffickers.   The telephone enables narcotics traffickers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers.   I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications.   I also know that narcotics traffickers frequently use pre-paid telephones with misleading subscriber information as a way of insulating themselves from criminal liability.

11.     The basis of the opinions and conclusions set forth below are drawn from my training, my experience with the FBI, my participation in the investigations of narcotics organizations, my conversations with FBI SA Richard J. Brooks, FBI SA Cody Burke, FBI SA Christopher N. Miner, FBI SA Suzanne Gertler, FBI SA Jeremy Stebbins, Los Angeles Police Department ("LAPD") Detectives Efren Gutierrez, Juan Santa and Jim Edwards and my conversations with other agents of the FBI, DEA, IRS, and other state and local law enforcement officers familiar with narcotics trafficking and money laundering matters.

## STATEMENT OF PROBABLE CAUSE

### *I.    Basis for Facts Set Forth in this Affidavit*

12.     I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation. Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

      a.   Oral and written reports about this investigation, which I have received from other federal agents and other law enforcement agencies;

**Instrumentality Protocol**

5

b.  Physical surveillance conducted by federal agents or local law enforcement

agencies, which has been reported to me either directly or indirectly;

c.  Information from a Confidential Source (hereinafter, "CS-1") [1]; and

d.  Law enforcement and public databases and records.

13.  Unless otherwise noted, when I assert that a statement was made, I have personal

knowledge of the information or I received the information from a law enforcement officer who

provided the information to me, either verbally or in a written report.   The officer had personal

knowledge of the information or received it from another law enforcement officer with personal

knowledge of the information.

## II.  *Background of the Investigation*

14.  In September 2013, the FBI, the DEA, and the LAPD began investigating the

narcotics trafficking activities of VILAVAZO.   As set forth further below, in mid-September,

2013, at the direction of law enforcement, CS-1 communicated by phone and text to purchase

methamphetamine from VILAVAZO.   VILAVAZO arranged for his nephew, HUERTA, to

provide CS-1 with the requested methamphetamine.   The communications between VILAVAZO,

HUERTA, and CS-1 eventually led to a September 26, 2013 transaction where CS-1 used

law-enforcement money to purchase more 48.6 grams of methamphetamine from HUERTA.

---

[1] CS-1 is a newly-developed CS who recently began giving information to the LAPD and the FBI.   CS-1 offered to
assist due to concerns that CS-1 had about VILAVAZO's alleged criminal activity, specifically a crime that CS-1
suspected that VILAVAZO committed against a friend of CS-1's.   CS-1 was introduced to VILAVAZO in the past
two years and has provided information to law enforcement about VILAVAZO and his organization that has been
corroborated by a criminal investigation and the drug trafficking activities of VILAVAZO.   CS-1 has received
compensation from the FBI.   CS-1 has also received minimal compensation from the LAPD for operational expenses
incurred while assisting the FBI and LAPD.   CS-1 has no documented criminal history.   Based on my training,
experience, knowledge of this investigation and my conversations with LAPD Detective Efren Gutierrez regarding the
aforementioned criminal investigation, I believe CS-1 to be reliable.

**Instrumentality Protocol**

6

### III.    September 26, 2013 Purchase of Methamphetamine

15.   CS-1 provided me with the following information:   On September 19, 2013, CS-1 sent VILAVAZO a text message stating that CS-1 "needed some of what I told you about last time."   CS-1 informed me that this was a reference to narcotics.[2]   Later that day, VILAVAZO asked CS-1 (a mechanic) to repair a vehicle.   CS-1 agreed and, after making the repairs, asked VILAVAZO about selling narcotics for VILAVAZO.   VILAVAZO told CS-1 that he had two pounds of methamphetamine, but had given the methamphetamine to someone else to hold for him because VILAVAZO felt that he was under close scrutiny for a recent murder.   VILAVAZO told CS-1 that he was not "slinging" anymore, but instead said he was spreading his two pounds of methamphetamine out.   VILAVAZO told CS-1 to contact him the next day and he would introduce CS-1 to the person who was holding the drugs for VILAVAZO.   VILAVAZO also asked CS-1 how quickly CS-1 could sell an ounce of methamphetamine to which CS-1 replied, "three days."

> a.   Based on my training and experience and my knowledge of this investigation, including subsequent debriefs of CS-1, I believe that when VILAVAZO said he was not "slinging" anymore, VILAVAZO meant that he was not conducting smaller-quantity transactions of methamphetamine.   I also believe that when VILAVAZO told CS-1 that he would introduce CS-1 to the person who was holding the drugs for VILAVAZO, VILAVAZO may have been referring to

---

[2] The conversations, text messages, and telephone calls described in this affidavit are not necessarily the entire conversation, nor are they necessarily the final exact verbatim transcript of each call.   The intercepted conversations used in this affidavit have been translated from Spanish and summarized/transcribed by Spanish speaking monitors and agents, but fully transcriptions have not been finalized.   Bracketed information in quotations has been inserted by me to provide context for the conversation or described coded language, based on the context of the communications, my training and experience, and my knowledge of the investigation.

**Instrumentality Protocol**

HUERTA, who, as set forth below, sold methamphetamine to CS-1 on September 26, 2013.

16.    On September 25, 2013, at approximately 3:22 p.m., CS-1 made a consensually recorded telephone call with VILAVAZO, to coordinate a future narcotics transaction.   During the conversation, CS-1 said, "Well, hey, they [HUERTA] haven't called me."[3]   VILAVAZO responded saying "I'm going to call the guy [HUERTA] so you can go with him [purchase methamphetamine from HUERTA]."   CS-1 responded saying, "....I need the work [methamphetamine].   You know I told you a while ago."   VILAVAZO said, "Look, let me – it's just that he [HUERTA] said that – that he wants you to pay all of it, man [pay for all of the methamphetamine at once]."   CS-1 continued, "No, well, I'm going to – but look, but who am I going to make the deal with, with you or with him [HUERTA]?"   VILAVAZO responded saying, "With him [HUERTA].   You – you're going to deal with him."   CS-1 said, "I want the job [to purchase the methamphetamine], but listen, you know that I know you, I – I don't know him [HUERTA]."   VILAVAZO said, "No, but that's why, but they – they're my people [HUERTA is an associate of VILAVAZO's], well, only." VILAVAZO went on to state, "The thing is I'm not – I'm not doing that.   That's why I'm just passing it on to him [HUERTA] so [Unintelligible (hereinafter "UI")]."   CS-1 responded, "Okay, so, uh, are you going to send me the number [for HUERTA] or what?"   VILAVAZO said, "Yeah, let – let me call him [HUERTA] and I'm going to tell him to call you."   CS-1 and VILAVAZO subsequently ended the call.

       a.  Based upon my training, experience, knowledge of this investigation and my

---

3 Parenthetical explanations of coded and vague communications throughout this affidavit are based on my interpretation, derived from my training, experience, conversations with other experienced agents, and my familiarity with this and previous investigations.

**Instrumentality Protocol**

subsequent debrief of CS-1, I believe that, in this call, CS-1 informed VILAVAZO

that VILAVAZO's narcotics associate, who I believe from subsequent events to be

HUERTA, had not yet called CS-1 to sell methamphetamine.   Based upon my

training, experience, information provided by CS-1, statements made by HUERTA

to CS-1, and my knowledge of this investigation, I believe that when VILAVAZO

told CS-1, "The thing is I'm not – I'm not doing that.   That's why I'm just passing

it on to him [HUERTA] so [UI]," VILAVAZO was referring to conducting

smaller-quantity transactions of methamphetamine.   In this call, CS-1 expressed

concern that CS-1 did not know HUERTA and wanted to confirm that CS-1 was

going to purchase methamphetamine from HUERTA.   VILAVAZO reassured

CS-1 that HUERTA was an associate of his and that VILAVAZO would have

HUERTA call CS-1 in the future for the purposes of coordinating the narcotics

transaction.

17.     On September 25, 2013, at approximately 3:53 p.m., CS-1 made a telephone call

with VILAVAZO, which was consensually recorded.   During the conversation, VILAVAZO said

"He – he's [HUERTA] is working right now, man.   He gets off until [at] 4:00." CS-1

subsequently asked, "Where are you?"   VILAVAZO responded, saying, "I'm far." VILAVAZO

subsequently said, "when he [HUERTA] goes to work right now, uh, he – he's going to call me

and that – that's when I'll tell him [HUERTA] to call you."   CS-1 responded, "Yeah, I need it

[methamphetamine], because, the truth is, well, I have some – some people that needs – well, that

wants that stuff [methamphetamine] and you know that if not [if HUERTA does not call]…."

VILAVAZO responded, "Yeah."   CS-1 said, "— the client will leave."   VILAVAZO later said,

**Instrumentality Protocol**

"As soon as he [HUERTA] gets off I'll call him and…"   CS-1 responded, "And what? Are you going to be there, because I don't know him [HUERTA], and the thing is to do the deal with you and with him [HUERTA], too, at the same time."   VILAVAZO responded, "It-it's the same thing [dealing with HUERTA is the same as dealing with me], he's [HUERTA is] my nephew."   CS-1 responded, "Oh, he's your nephew?"   VILAVAZO responded, "yeah."

    a.  Based upon my training, experience, knowledge of this investigation, including my subsequent debrief of CS-1, I believe that in the call above, VILAVAZO explained to CS-1 that HUERTA had not called CS-1 because HUERTA was working, but that VILAVAZO would call HUERTA.   VILAVAZO assured CS-1 that dealing with HUERTA is "the same thing" as dealing with VILAVAZO because HUERTA is VILAVAZO's nephew.   Thus, I believe that that HUERTA is a member of VILAVAZO's DTO, but that HUERTA handles smaller drug quantity.

18.    I have reviewed toll records for the phone that HUERTA used to make the above-referenced calls to CS At 4:58 p.m., toll records show that HUERTA contacted VILAVAZO.   Two minutes later, at 5:00 p.m., HUERTA contacted CS-1, told CS-1 that he was VILAVAZO's relative, that VILAVAZO had given him CS-1's number, and asked if CS-1 was interested in purchasing narcotics.   This call was not recorded, but CS-1 called me immediately after this call to inform me about it and I again debriefed CS-1 about the call the following day.

    a.  Based on my training and experience and my knowledge of the investigation, I believe that during the telephonic contact between HUERTA and VILAVAZO shown in the toll records, it is likely that VILAVAZO told HUERTA that CS-1 was looking to purchase methamphetamine and directed HUERTA to contact CS-1 in

**Instrumentality Protocol**

10

000233

order to sell CS-1 methamphetamine. This is further evidenced by the fact that HUERTA called CS-1 within two minutes of HUERTA's telephonic contact with VILAVAZO.

19.     CS-1 contacted VILAVAZO several times in the early evening of September 26, 2013, but did not reach him. At 6:10 p.m., VILAVAZO returned CS-1's call and CS-1 informed him that HUERTA's phone had been disconnected. This call was recorded. VILAVAZO and CS-1 spoke again about 30 minutes later, and CS-1 asked VILAVAZO to tell HUERTA to lower the price of the methamphetamine because the price that HUERTA had previously quoted was higher than the price that VILAVAZO and CS-1 had initially discussed. This call was also recorded. The majority of VILAVAZO's responses to CS-1's demands and questions during this call were unintelligible to the interpreters transcribing these calls. CS-1 reviewed the transcripts and informed me about what CS-1 recalled VILAVAZO saying during the call. Specifically, CS-1 told me that VILAVAZO agreed to tell HUERTA to lower the price of the methamphetamine.

20.     During a subsequent consensually recorded call and various text messages, CS-1 and HUERTA arranged the drug deal. The majority of HUERTA's side of the conversation was unintelligible to the interpreters transcribing these calls. CS-1 reviewed the transcripts and informed me about what CS-1 recalled HUERTA saying during the call. Notably, CS-1 recalled that when CS-1 told HUERTA that he had already negotiated a lower price with VILAVAZO for the two ounces of methamphetamine, HUERTA told CS-1 to check out the methamphetamine and, if CS-1 liked it, HUERTA would provide it to CS-1 for the lower price.

21.     At approximately 8:00 p.m. that evening, CS-1 met with a man later identified as

**Instrumentality Protocol**

11

HUERTA in a restaurant parking lot in North Hollywood.   The meeting was recorded and

observed by agents; however it was too dark for agents to clearly see HUERTA.   HUERTA was

in HUERTA's VEHICLE.

22.     During the conversation, CS-1 asked "are you working with Mike (Vilavazo) ... or

is this your work."   Huerta responded, "this one ... is from the same company."   Huerta later

stated, "Mike [VILAVAZO] does not sell small ones... I'm the one in charge selling it like this."

Later, when CS-1 inquired about whether HUERTA had a connection for "soda" (cocaine),

HUERTA responded, "I don't have it but ... the one that works with me ... we are all one hand ...

one finger of the hand."   CS-1 later stated, "...if the work is yours, you better tell me, no?   To

work with you instead."   HUERTA responded, "... no, no, no. Right now uh ... not, it's not that I

am ... Mike and I are the same."

> a.   Based on my training and experience and my knowledge of this investigation, I
>
>      believe that HUERTA's statements about "same company," "one finger of the
>
>      hand" and "Mike and I are the same" indicate that VILAVAZO and HUERTA are
>
>      likely part of the same drug trafficking organization.

23.     Also during the meet, HUERTA stated that while he was in charge of selling small

quantities, "I also do the big stuff, but to me is better to sell like this.   Because, uh, I have it there

ready and I help people to make money also ... Because ... if I sell you everything at once, it may

be that it gets lost ... and this way you make more."

> a.   Based on my training and experience and my knowledge of this investigation, I
>
>      believe that when HUERTA said, "I also do the big stuff," he meant that he also
>
>      distributes large quantities of methamphetamine.   When HUERTA said "I have it

**Instrumentality Protocol**

12

000235

there ready," he meant that he keeps narcotics on hand for quick distribution. Finally, when HUERTA explained that "if I sell you everything at once, it may be that it gets lost," he meant that if he sells larger quantities, they may get stolen or seized by the police.   This may be particularly problematic for HUERTA if he sells narcotics on credit because if the drugs were stolen or seized, HUERTA may not be paid by his customer.

24.   Additionally, during the meet, HUERTA told CS-1 that to reach him in the future, CS-1 should send a text message stating, "Hey, can you call me?"   HUERTA also confirmed that he had disconnected his prior telephone (as discussed by CS-1 and VILAVAZO during the recorded call mentioned above).   HUERTA then said, "so we don't use the telephone that much." Later during the meet, HUERTA said, "…I change the phone almost every month."   HUERTA also told CS-1 that when CS-1 texts HUERTA to contact him, HUERTA would "call you from another cellular …"

     a.   Based on my training and experience and my knowledge of this investigation, I believe that in this portion of his conversation with CS-1, HUERTA is indicating that he does not use the telephone and routinely changes telephones to avoid law enforcement detection.

25.   HUERTA charged CS-1 $950 for two bags containing what was later determined to be 55.9 grams of 87% pure methamphetamine (48.6 grams of actual methamphetamine).   CS-1 only had $20 bills, so CS-1 paid HUERTA $960 and HUERTA agreed to credit CS-1 the $10 toward his next methamphetamine purchase.   This information was reported by CS-1 and is corroborated by the audio recording.

**Instrumentality Protocol**

13

26.     On October 7, 2013, during a consensually recorded call, CS-1 contacted

VILAVAZO to inform VILAVAZO that CS-1's customers liked the methamphetamine that

HUERTA provided to him and CS-1 wanted to purchase half a pound from VILAVAZO.   The

following is an excerpt from that the conversation:

> …
> CS-1:       No, well, uhm, you see, the thing your nephew gave me [noise] is
>             good, man.
> VILAVAZO: Really?
> CS-1:       Yes.   No, it's good, but I need a little more because people are—are
>             now asking me for it and I have a buyer who's going to give me …
> VILAVAZO: Call my – my nephew, man. [HUERTA]
>
> CS-1:       No, but could I make arrangements with him regarding mm … Well,
>             I really want half ou—half—half a pound.
> VILAVAZO: Uhm ..
> CS-1:       But because, okay, I know he – the one who
> VILAVAZO: Look, let—let—let me get there.
> CS-1:       Where to?
> VILAVAZO: I'll get there tomorrow.
> CS-1:       Oh, really?
> VILAVAZO: Yes, I'll get there tomorrow.   I'm just … I-I'm in Oklahoma right
>             now.
> CS-1:       Okay.
> VILAVAZO: I'll get there tomorrow.   I already … But call him [HUERTA] if
>             you need a little bit because I think he has a little bit left.
> CS-1:       No, no, well, I don't want a little bit because since it turned out
>             good, people are buying from me and stuff.   Uhm, I need half a – a
>             pound, man.
> VILAVAZO: Yeah. Let me – I'll – I'll get there tomorrow.

a.   Based on my training and experience and my knowledge of this investigation, I

believe that this conversation provides additional evidence that HUERTA is a

repeat narcotics trafficker and that his September 26, 2013 methamphetamine deal

with CS-1 was not an anomaly.   I believe this call also shows that HUERTA likely

maintains narcotics on hand such that he is able to promptly fill drug customer's

**Instrumentality Protocol**

14

orders.

### IV.    *Identification of HUERTA*

27.     The same night that HUERTA sold CS-1 the methamphetamine, CS-1 described HUERTA to law enforcement officers as a Hispanic male who appeared to be approximately 23 years old, 5'9" tall, weighed 160 pounds and had dark skin and black hair.   Also that night, agents showed CS-1 a DMV photograph of the man to whom LAPD officers thought HUERTA's VEHICLE was registered.   CS-1 identified the man in this photograph as the person with whom CS-1 had purchased the narcotics.   Ultimately, however, agents discovered that (1) the man who was originally shown to CS-1 was not actually the registered owner of HUERTA's VEHICLE; and (2) the registered owner of HUERTA's VEHICLE did not look like the person from whom CS-1 purchased the methamphetamine.   After further investigation including several surveillances, I presented CS-1 with the person who agents had repeatedly seen driving HUERTA's VEHICLE since the drug deal.   CS-1 recanted CS-1's original identification and identified the man in the surveillance photograph (later identified as HUERTA) as the man who sold CS-1 the methamphetamine.

28.     In addition to CS-1's subsequent identification of HUERTA, I have confirmed that HUERTA is the man who sold CS-1 the methamphetamine on September 26, 2013, in the followings ways:

      a.   Phone records revealed that the phone HUERTA originally used to contact both VILAVAZO and CS-1 (the one HUERTA later stopped using) was registered to "Jorge Huerta."

      b.   While HUERTA's VEHICLE is registered to Sam Lopez, the address to which it is

**Instrumentality Protocol**

15

registered is the HUERTA RESIDENCE.   Agents conducted surveillance at the
HUERTA RESIDENCE on several occasions between November 20, 2013 and
April 3, 2014 where they saw HUERTA, HUERTA's VEHICLE and the registered
owner of HUERTA's VEHICLE, Samuel Lopez (whom I believe to be a relative of
HUERTA's).

c.  HUERTA matches the physical description given by CS-1 on the night of the
methamphetamine deal.

d.  Samuel Lopez is noticeably older than HUERTA and does not look like HUERTA,
nor does Samuel Lopez fit the description given by CS-1 of the man who sold CS-1
methamphetamine on September 26, 2013.

e.  I and other law enforcement officers have seen HUERTA driving HUERTA's
vehicle on numerous occasions between November 20, 2013 and December 30,
2013.

f.  The billing address for the second phone that HUERTA used to call CS-1 is the
HUERTA RESIDENCE.

g.  Agents also received information linking the HUERTA's VEHICLE to a
warehouse in San Fernando.   On or about   November 20, 2013, agents saw a man
resembling HUERTA enter HUERTA's VEHICLE and drive it from the
warehouse to the HUERTA RESIDENCE.   Agents saw HUERTA exit
HUERTA's VEHICLE and enter the house at the HUERTA RESIDENCE.

h.  HUERTA's state criminal history record (rap sheet) dated February 15, 2014, lists
his "latest address" as the HUERTA RESIDENCE.

**Instrumentality Protocol**

i.   On or about October 25, 2013, agents also saw a car registered to "Sam Lopez and/or Jorge Huerta" parked in the driveway of a residence that agents had previously determined was VILAVAZO's residence.

j.   HUERTA refers to himself by the moniker "Moreno" on one of the recorded calls. Based on my training and experience and a discussion with a Spanish-speaking agent, the Spanish word "moreno" is literally translated "brown," but is often used to refer to people with dark skin.   I have observed both on surveillance and in a California state photograph of HUERTA that he has a relatively dark complexion.

## V.   *HUERTA's Association with the SUBJECT PREMISES*

29.   I believe that the HUERTA RESIDENCE is indeed HUERTA's residence because I and other agents have seen HUERTA at the HUERTA RESIDENCE repeatedly during the course of the investigation.   For instance, on  November 20, 2013, I followed HUERTA in HUERTA's VEHICLE to the HUERTA RESIDENCE and I saw HUERTA park HUERTA's VEHICLE at the HUERTA RESIDENCE enter the door of the HUERTA RESIDENCE and go inside.

30.   Additionally, on Thursday, April 3, 2014, agents saw HUERTA's VEHICLE parked in the driveway of the HUERTA RESIDENCE.   Thus, I believe that HUERTA still resides at the HUERTA RESIDENCE and is still using HUERTA's VEHICLE.

## VI.   *Evidence of Crimes is Likely to Be Found at SUBJECT PREMISES*

31.   There is probable cause to believe that HUERTA stores evidence of his narcotics trafficking at the HUERTA ADDRESS.

a.   I know from my conversations with Assistant United States Attorney Angela Scott

**Instrumentality Protocol**

17

that the case law in the Ninth Circuit establishes a general presumption that

individuals involved in drug trafficking conspiracies, including their assistants,

maintain evidence of these crimes in their residences.[4]

b.   Additionally, as noted above, both HUERTA and VILAVAZO indicated during

phone conversations with CS-1 that HUERTA keeps drugs readily available for his

customers.

c.   Also as noted above, HUERTA's conversations with CS-1 reveal that he is a repeat

offender and that the September 26, 2013 deal with CS-1 was not HUERTA's first

narcotics trafficking activity, which makes it likely that HUERTA maintains

records of his narcotics trafficking activities.   Indeed, HUERTA indicated that he

does not like to use telephones and routinely changes his telephone.   As discussed

in paragraph 23 above, HUERTA also told CS-1 how he typically conducts his

narcotics trafficking business:   "I also do the big stuff, but to me is better to sell

like this.   Because, uh, I have it there ready and I help people to make money also

… Because … if I sell you everything at once, it may be that it gets lost … and this

way you make more."

32.   There is probable cause to believe that evidence of HUERTA's narcotics

trafficking will be found in HUERTA's VEHICLE.   As noted above, HUERTA routinely uses

---

4 AUSA Scott provided me the following case citations: "In the case of drug dealers, evidence is likely to be found where the dealers live."  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) (citations omitted). "When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's."  Angulo-Lopez, 791 F.2d at 1399 (citations omitted).  "[E]vidence discovered by [] officers linking the defendants to a drug scheme provide[s] 'more than a sufficient showing for obtaining the warrant to search [their] ... residence.'"  United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) (quotation and citation omitted).   Also an unpublished decision refers to this common-sense principle as the "residency presumption."  United States. v. Crowell, 1993 WL 493743, *2 (9th Cir. 1993) (unpublished).

**Instrumentality Protocol**

18

HUERTA's VEHICLE, including to deliver methamphetamine and to pick up proceeds from narcotics trafficking.

33.    Also, based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

a.    Individuals involved in narcotics trafficking often use various locations to serve different functions so that customers, thieves, and law enforcement do not learn about any one location where large quantities of narcotics, money, and/or other drug-related assets are stored. Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or drug-related assets, and additional locations are used to meet customers.

b.    Drug trafficking is an ongoing or continuing criminal enterprise and narcotics traffickers will frequently keep records, documents, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence, even if they do not keep narcotics at these locations.

c.    Because narcotics traffickers frequently continue their criminal activity indefinitely, they keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses controlled substances, in order to maintain contact with criminal associates for future narcotic transactions, and to have records of prior transactions for which, for example, they might still be owed narcotics proceeds, or might owe someone else money.   Because possession of the documents themselves, unlike possession of narcotics, is not illegal, narcotics traffickers often fail to take precautions to destroy or conceal the documentation. Therefore, documentation may survive for many months, sometimes years, after a large volume

**Instrumentality Protocol**

drug transaction has occurred, often in the traffickers' residences and vehicles.   Such documentation may be in hard copy form or stored in digital devices such as cell telephones and other mobile communication devices.

      d.   Individuals involved in narcotics trafficking often conceal evidence of their drug trafficking, including narcotics and narcotics proceeds, in their residences, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.   They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

      e.   Individuals involved in narcotics trafficking often use vehicles to hide and transport narcotics and/or narcotics proceeds, as well as using them to conduct their narcotics and/or narcotics proceeds transactions.   It is common practice for narcotics traffickers to install hidden compartments in their vehicles in order to store and transport narcotics and/or narcotics proceeds.

      f.   Individuals involved in narcotics trafficking will sometimes rent storage lockers to store narcotics.   These traffickers often have in their immediate possession or in their residences, keys, receipts, and other documents evidencing the rental of said storage lockers.

      g.   Individuals involved in narcotics trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware, cellophane, heat sealers, gylcine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.).   Individuals involved in narcotics trafficking commonly store these items in their

**Instrumentality Protocol**

20

000243

residences, garages, outbuildings, storage areas, carports, and in the residences of friends or relatives, in their vehicles, and in other areas to which the traffickers have ready access.

h.  Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit, and commonly obtain narcotics from their suppliers on credit.   Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to thwart law enforcement detection.   The aforementioned books, records, receipts, notes, ledgers, correspondence, etc., are commonly maintained where the narcotics traffickers have ready access to them, i.e., homes, offices, and automobiles.

i.  Individuals involved in narcotics trafficking often use cellular telephones and other communication devices sometimes in fictitious and/or other individual's names.   Traffickers commonly receive telephone calls, voicemail messages and text messages from individuals seeking to conduct narcotics transactions.   As a result, traffickers often maintain in their residences, vehicles, and locations where they conduct transactions, records and items that reflect or contain names, addresses, and/or telephone numbers for their associates and co-conspirators in the drug trafficking organization.   These records and items include telephone address books and telephone listings, text messages, voicemails, as well as letters, telephone bills, e-mails, and personal notes reflecting names, identities, addresses, and telephone numbers.   Traffickers often keep records and evidence of their illegal activities for a period of time extending beyond during which they actually possessed illegal narcotics and controlled substances, in order to maintain contact with their criminal associates for future drug transactions, and so that they can have

**Instrumentality Protocol**

21

records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

j.   Narcotics traffickers often take or cause to be taken photographs of themselves, their associates, their property, and their products, and these traffickers usually maintain these photographs in their residences, vehicles, and/or businesses.

k.   Narcotics traffickers possess DMV registration and ownership records of "load cars" used to transport narcotics; and that these items are maintained and kept by the narcotics trafficker in much the same way legitimate businesses will maintain their "tools of the trade," whether or not there is contraband in the vehicle on a given day.

l.   Individuals involved in narcotics trafficking sometimes have in their possession, that is, on their persons, at their residence and/or at their stash houses, firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and/or other weapons, as well as ammunition and ammunition components, that are used to protect and secure the narcotic traffickers' property.

m.   Individuals involved in narcotics trafficking generally sell narcotics for cash proceeds.   Therefore, narcotics traffickers typically may have thousands of dollars in cash on hand both as proceeds of sales, to purchase their own supplies, and profits from their narcotics trafficking activities (such as profits from sales or profits from the transportation of narcotics or narcotics proceeds).   In addition, narcotics traffickers often have other assets generated by their narcotics business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.   Narcotics traffickers often keep these items, and records reflecting their purchase or sale such as automobile titles or deeds to property, as well as

**Instrumentality Protocol**

evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities in their residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

n.   Individuals involved in narcotics trafficking often launder money obtained through illegal drug transactions through legitimate businesses.   Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions.   To escape detection, however, they mix and intermingle those records with records of lawful transactions.   In such instances, it is necessary to analyze the entire record to isolate the records of unlawful transactions, and it is not feasible to extract the records of unlawful activities without such analysis.

o.   Additionally, when narcotics traffickers amass large quantities of cash from the sale of narcotics, they will sometimes attempt to legitimize these profits through the use of banks and financial institutions and their services, including accounts, securities, traveler's checks, cashiers' checks, money orders, wire transfers, certificates of deposit, and safe deposit boxes. Records from such transactions are often maintained in residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

p.   Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

q.   Individuals involved in narcotics trafficking organizations that operate both in the United States and Mexico will frequently transport bulk quantities of their illicit proceeds from the United States into Mexico.   Narcotics traffickers will commonly use vehicles with hidden compartments to transport their narcotics proceeds from the United States into Mexico.

**Instrumentality Protocol**

23

Additionally, I have also learned from other law enforcement personnel who are experienced in narcotics investigations that (1) narcotics traffickers will also transfer large amounts of their illicit proceeds onto one or more stored-value cards so that they can inconspicuously transport these large sums in the United States and from the United States to Mexico; and/or (2) narcotics traffickers with launder money through local businesses.

r.   Individuals involved in narcotics trafficking often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement; and that even though these assets are in other persons' names, the narcotics traffickers retain records, documents, and deeds reflecting the purchase of those assets, while continuing to use those assets and exercise dominion and control over them.

s.   It is common practice for narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; after purchasing narcotics, narcotics traffickers will transport or cause to be transported narcotics and/or narcotics proceeds for further distribution; methods of transportation include rental and private automobiles, and government and contract mail carriers.

t.   Narcotics traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sale such narcotics traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.

u.   Narcotics traffickers will often secrete controlled substances and narcotics proceeds in hidden compartments or manufactured spaces, to include within the walls of their residences and garages, within furniture contained in their residences, etc.

**Instrumentality Protocol**

24

000247

## VII.    *Training and Experience on Digital Devices*

34.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.   There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.   In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or

**Instrumentality Protocol**

25

destruction.   Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.   As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.   A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.   A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.   Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.   Electronic files saved to a hard drive can be stored for years with little or no cost.   Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   Normally, when a person deletes a file on a computer, the data contained in the file does not actually

**Instrumentality Protocol**

26

disappear; rather, that data remains on the hard drive until it is overwritten by new data.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.   The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.   Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.   Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those

**Instrumentality Protocol**

000250

records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.   Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.   Computer file systems can record data about the dates files were created and the sequence in which they were created.   This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.   For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.

**Instrumentality Protocol**

28

Evidence of the absence of particular data on a digital device is not segregable from

the digital device.   Analysis of the digital device as a whole to demonstrate the

absence of particular data requires specialized tools and a controlled laboratory

environment, and can require substantial time.

g.   Other than what has been described herein, to my knowledge, the United States has

not attempted to obtain this data by other means.

## CONCLUSION

35.   Based on the foregoing, I submit there is probable cause to believe that evidence,

fruits, and instrumentalities of conspiracy to distribute controlled substances and distribution of

controlled substances, in violation of 21 U.S.C §§ 846 and 841(a)(1), as those items are set forth in

ATTACHMENT B, will be located at the SUBJECT PREMISES (as those are described in

ATTACHMENTS A-1 and A-2).


_____/s/_____

Michael E. Alker
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
on this 14th day of April 2014.

Margaret A. Nagle
UNITED STATES MAGISTRATE JUDGE


**Instrumentality Protocol**

29

000252

# EXHIBIT 1

A6

FILED

2014 APR 10  PM 1: 06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2013 Grand Jury

**CR 14 00209**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>ISMAEL GUTIERREZ VILAVAZO,<br>     aka "Ismael Gutierrez,"<br>     aka "Mike Gutierrez,"<br>     aka "Mikey," and<br>JORGE BERISTAIN HUERTA,<br>     aka "Moreno,"<br><br>          Defendants. | CR No. 14-<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to Distribute Methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii): Distribution of Methamphetamine; 21 U.S.C. § 843(b): Use of a Telephone to Facilitate a Felony Drug Offense; and 18 U.S.C. § 2(a): Aiding and Abetting and Causing an Act to be Done] |

The Grand Jury charges:

## COUNT ONE

### [21 U.S.C. § 846]

A.   OBJECT OF THE CONSPIRACY

     Beginning on a date unknown and continuing to on or about

October 7, 2013, in Los Angeles County, within the Central District

of California, and elsewhere, defendants ISMAEL GUTIERREZ VILAVAZO,

also known as ("aka") "Ismael Gutierrez," aka "Mike Gutierrez," aka

"Mikey," and JORGE BERISTAIN HUERTA, aka "Moreno," and others known

000254

1 and unknown to the Grand Jury, conspired and agreed with each other
2 to knowingly and intentionally distribute at least five grams of
3 methamphetamine, a Schedule II controlled substance, in violation of
4 Title 21, United States Code, Sections 841(a)(1) and
5 841(b)(1)(B)(viii).

6 B.   <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE</u>
7      <u>ACCOMPLISHED.</u>

8      The object of the conspiracy was to be accomplished in substance
9 as follows:

10     1.   Defendant VILAVAZO would obtain methamphetamine for
11 distribution to customers in the Los Angeles area and elsewhere.

12     2.   Defendant HUERTA, on behalf of defendant VILAVAZO, would
13 store methamphetamine for later distribution to customers.

14     3.   Defendant VILAVAZO would arrange the basic terms of the
15 sale of methamphetamine to customers.

16     4.   As arranged by defendant VILAVAZO, defendant HUERTA would
17 deliver methamphetamine to, and pick up payment for the
18 methamphetamine from, the customers.

19 C.   <u>OVERT ACTS</u>

20     In furtherance of the conspiracy, and to accomplish the objects
21 of the conspiracy, on or about the following dates, defendants
22 VILAVAZO and HUERTA, and others known and unknown to the Grand Jury,
23 committed various overt acts within the Central District of
24 California, including but not limited to the following:

25     1.   On September 19, 2013, defendant VILAVAZO told an
26 individual whom defendant VILAVAZO believed to be a methamphetamine
27 customer but who was, in fact, a confidential source working for law
28 enforcement (hereinafter, "the CS") to call defendant VILAVAZO the

2

1  following day and defendant VILAVAZO would introduce the CS to a

2  person who was holding methamphetamine on behalf of defendant

3  VILAVAZO.

4      2.   On September 25, 2013, using coded language in a telephone

5  call, defendant VILAVAZO explained to the CS that methamphetamine

6  would be distributed to the CS by individuals whom defendant VILAVAZO

7  referred to as "my people."

8      3.   On September 25, 2013, using coded language in a telephone

9  call, defendant VILAVAZO explained to the CS that the individual who

10  would distribute the methamphetamine to the CS was his nephew.

11      4.   On September 25, 2013, defendant VILAVAZO spoke with

12  defendant HUERTA about the methamphetamine transaction that defendant

13  VILAVAZO had negotiated with the CS.

14      5.   On September 25, 2013, at the direction of defendant

15  VILAVAZO, defendant HUERTA contacted the CS to discuss when they

16  would be able to meet to complete the methamphetamine transaction.

17      6.   On September 26, 2013, using coded language in a telephone

18  call, defendant VILAVAZO agreed with the CS that he would tell

19  defendant HUERTA to lower the price of the methamphetamine defendant

20  VILAVAZO had arranged to sell to the CS.

21      7.   On September 26, 2013, using coded language in a telephone

22  call, defendant HUERTA told the CS that the methamphetamine the CS

23  wanted to purchase would be sold to the CS at a lower price.

24      8.   On September 26, 2013, in the parking lot of a North

25  Hollywood restaurant, defendant HUERTA distributed approximately 48.6

26  grams of methamphetamine to the CS.

27      9.   On September 26, 2013, defendant HUERTA received $960 from

28  the CS, $950 of which was payment for the methamphetamine that

3

defendant HUERTA sold to the CS that day and $10 of which defendant HUERTA held as credit for a future narcotics transaction with the CS.

10.  On October 7, 2013, using coded language in a telephone call, defendant VILAVAZO told the CS that he was out of town and was not immediately available to meet the CS, but that defendant HUERTA had a small quantity of methamphetamine left that the CS could purchase in defendant VILAVAZO's absence.

11.  On October 7, 2013, using coded language in a telephone call, defendant VILAVAZO agreed to distribute one-half pound of methamphetamine to the CS.

4

000257

COUNTS THREE THROUGH EIGHT

[21 U.S.C. § 843(b)]

On or about the dates and times set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISMAEL GUTIERREZ VILAVAZO, also known as ("aka") "Ismael Gutierrez," aka "Mike Gutierrez," aka "Mikey," knowingly and intentionally used a communication facility, namely, a telephone, in committing and in causing and facilitating the commission of an act constituting a felony under Title 21, United States Code, Section 846, namely, conspiracy to distribute methamphetamine, as charged in Count One, and under Title 21, United States Code, Section 841(a)(1), namely, distribution of methamphetamine, as charged in Count Two:

| COUNT | DATE/TIME |
|-------|-----------|
| THREE | 9/25/13 3:22 p.m. |
| FOUR | 9/25/13 3:53 p.m. |
| FIVE | 9/25/13 4:58 p.m. |
| SIX | 9/26/13 6:10 p.m. |

6

000258

| COUNT | DATE/TIME |
|-------|-----------|
| SEVEN | 9/26/13<br>6:43 p.m. |
| EIGHT | 10/7/13<br>5:24 p.m. |

7

000259

| COUNT | DATE/TIME |
|---|---|
| ELEVEN | 9/26/13<br>7:27 p.m. |

A TRUE BILL

/S/

_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

KEVIN M. LALLY
Assistant United States Attorney
Chief, OCDETF Section

ROB B. VILLEZA
Assistant United States Attorney
Deputy Chief, OCDETF Section

ANGELA L. SCOTT
Assistant United States Attorney
OCDETF Section

9

000260